# 12 CV 6966

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

CONTINENTAL INDUSTRIES GROUP, INC.,

                 Plaintiff,

   -against-

FTS INTERNATIONAL SERVICES, LLC
(f/k/a Frac Tech Services, LLC),

                 Defendant.

-------------------------------------------------------- x

2012 Civ._____ (_____)

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
SEP 1 3 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Continental Industries Group, Inc. ("Plaintiff" or "CIG"), by its attorneys, LeClairRyan, A Professional Corporation, as and for its Complaint against Defendant, FTS International Services, LLC (f/k/a Frac Tech Services, LLC) ("Defendant" or "FTS"), states as follows:

## NATURE OF THIS ACTION

1.     This action seeks damages arising from Defendant's breaches of its June 2, 2011 Supply Agreement with Plaintiff (the "Supply Agreement"). Pursuant to the terms of the Supply Agreement, the parties agreed that Plaintiff would sell and Defendant would purchase a minimum of fifty-thousand and up to sixty-thousand metric tons of guar gum and derivatives ("guar gum" or the "Product") over a period of five years, which would be sourced from a new plant that Plaintiff was building in India (the "Facility") in conjunction with an Indian partner (the "Indian Partner"). Defendant also agreed that, upon being notified that certain specified milestones with respect to the development of the Facility were met, Defendant would make prepayments for the Product to Plaintiff in the aggregate amount of $8.5 million.

7460909-1

2.     Defendant never made any prepayments, despite receiving notices from Plaintiff that it had achieved certain of the milestones.  And on July 2, 2012, Defendant sent a letter to Plaintiff purportedly terminating the Supply Agreement (the "Termination Letter") in violation of the express terms of the agreement.  Defendant identified no legitimate basis for terminating the Supply Agreement in the Termination Letter, instead offering only conclusory claims that Plaintiff had somehow breached the Supply Agreement.

3.     As a result of Defendant's improper purported termination of the Supply Agreement, and other material breaches thereof, Plaintiff has suffered or will suffer damages in the amount of no less than the $54 million.

### THE PARTIES

4.     Plaintiff, CIG, is a New York corporation with its headquarters and principal place of business at 733 Third Avenue, New York, New York 10017.  CIG is a trading and distribution company active in the field of petrochemicals, industrial chemicals, plastic resins, and energy chemicals (i.e., oil and gas drilling and production chemicals), including, but not limited to, guar gum powder and derivatives, and conducts business worldwide.

5.     On information and belief, Defendant, FTS, is a Texas corporation with its headquarters and principal place of business at 777 Main Street, Fort Worth, Texas 76102.  Also on information and belief, FTS is a provider of well stimulation services for the oil and gas industry, commonly known as "fracking."

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28

2

U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has jurisdiction over the Defendant pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules in that this action arose out of the Defendant's transaction of business in the State of New York, and, on information and belief, Defendant is present and regularly does business in the State of New York. Pursuant to the terms of the Supply Agreement, the parties also agreed to the exclusive jurisdiction of the federal and state courts sitting in New York, New York to address any disputes arising from the Supply Agreement. (Supply Agreement § 16(d) (attached hereto as Exhibit 1)).

8.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claims herein occurred in this District. Pursuant to the terms of the Supply Agreement, the parties also agreed that venue in this District is appropriate. (Supply Agreement § 16(d)).

## **BACKGROUND**

The Role of Guar Gum

9.     Guar is an agricultural product and, on information and belief, over 90% of the world's supply of guar is grown in India. Guar has a number of uses, including agricultural applications (as food for livestock), food applications, and industrial applications. One common industrial application of guar is the production of guar gum, which can be used in hydraulic fracturing, commonly known as "fracking," a process utilized to release petroleum, natural gas, or other substances for extraction.

7460909-1

10.     On information and belief, FTS's business involves, inter alia, the provision of fracking services to customers in the petroleum and natural gas industries, and as a result, FTS has an interest in using guar gum in connection with these activities.

11.     On information and belief, because guar gum is derived from a naturally occurring agricultural product, it is perceived to be an environmentally sound component of the fracking process and therefore the interest of the energy industry in using guar gum in this process, particularly for the extraction of shale gas, has recently increased.

The Parties Discuss Entering Into a Business Relationship

12.     In early 2011, the parties began discussing a possible arrangement whereby CIG would supply Product to FTS.

13.     On information and belief, FTS was interested in pursuing discussions with CIG because, among other reasons, FTS did not want to be reliant on its then-sole or principal guar supplier.

14.     On February 22, 2011, representatives of CIG and FTS met at CIG's offices in New York to discuss a possible long term supply agreement.  At that time, the representatives of FTS described FTS's guar requirements and told CIG that FTS believed that it needed a dedicated or contracted supply of guar.

15.     On March 10, 2011, Brad Holms and Marc Rowland, the Executive Vice President and Chief Executive Officer, respectively, of FTS, again visited the CIG offices in New York to discuss and finalize operational and financial terms and conditions of the contemplated long-term supply agreement.  At that meeting, Mr. Rowland informed CIG that

4

FTS would be willing to procure 100% of a proposed plant's planned output, given that FTS

wanted the plant to manufacture product exclusively for FTS and to FTS's specifications.

<u>The Parties Enter Into the Supply Agreement</u>

      16.    Effective June 2, 2011, the parties entered into the Supply Agreement.  Pursuant

to the terms of the Supply Agreement, the parties agreed, in relevant part, as follows:

- CIG would use commercially reasonable efforts to manufacture and deliver to
  FTS 10,000 metric tons of Product, which would be manufactured to agreed-upon
  specifications, each year over the five year term of the Supply Agreement (the
  "Term"), with an option to sell up to 2,000 additional metric tons of Product to
  FTS each year during the Term. (Supply Agreement ¶ 3(a)).

- FTS would make four prepayments for Product to CIG, each in the amount of
  $2,125,000. (Supply Agreement ¶ 2).  The four prepayments would be due as
  follows:

- within fifteen days after FTS received notice from CIG of the "Indian Partner
  Agreement Date"; i.e., CIG's entry into an agreement with its Indian Partner to
  construct the Facility (the "Initial Prepayment") (Supply Agreement ¶ 2(a));

- within fifteen days after FTS received notice from CIG of the "Facility
  Construction Date"; i.e., the date when construction of the Facility began (the
  "Second Prepayment") (Supply Agreement ¶ 2(b));

5

- within fifteen days after FTS received notice from CIG of the "Facility Completion Date"; i.e., the date when construction of the Facility is completed (Supply Agreement ¶ 2(c)); and

- within fifteen days after FTS received notice from CIG of the "Facility Equipment Date"; i.e., the date that all equipment necessary to produce product in marketable quantities was installed at the Facility. (Supply Agreement ¶ 2(f)).

- The price of the Product would be determined in accordance with the market price of guar published on an Indian commodities index. (Supply Agreement ¶ 2(f)).

17.     The Supply Agreement set forth CIG's expectation for when the Indian Partner Agreement Date and the "Commercial Purchase Date" (the date on which the first shipment of Product took place) would occur, but it included no specific or firm dates for performance. (Supply Agreement ¶ 1(b)).

18.     The parties agreed that FTS could only terminate the Term of the Supply Agreement 1) by mutual agreement with CIG; 2) if CIG became insolvent or sought bankruptcy protection; or 3) if CIG materially breached the Supply Agreement and such material breach was not remedied within ninety days after the receipt by CIG of written notice from FTS of the material breach. (Supply Agreement ¶ 12).

19.     The Supply Agreement also included a provision requiring that, in the event of a dispute between the parties regarding the Supply Agreement, the party noting the dispute was required to notify the other party, in writing, of the existence of the dispute and was required to

ask that the other party to meet in New York City within thirty days to attempt to resolve the dispute. (Supply Agreement ¶¶ 16(a), 16(b)).

CIG Performs Under the Supply Agreement

20.     After the Supply Agreement was signed, and in reliance thereon, CIG entered into an agreement with the Indian Partner for the construction and operation of a factory in India to produce the Product that would be sold to FTS under the terms of the Supply Agreement.

21.     After the agreement with the Indian Partner was signed, work commenced on the construction of the Facility.

22.     In November 2011 representatives of both parties travelled to India to visit the Facility, which was in the process of being constructed.  At that time, the representatives of FTS conveyed to CIG that they were satisfied with the progress of the Facility.

23.     On January 23, 2012, CIG notified FTS of the Indian Party Agreement Date; i.e., that CIG had executed an agreement with its Indian Partner to build the Facility as contemplated by the Supply Agreement, thereby triggering FTS's obligation to make the Initial Prepayment in the amount of $2,125,000 within fifteen days.  FTS never made that payment.

24.     Also on January 23, 2012, CIG notified FTS of the Facility Construction Date; i.e., that construction of the Facility had begun; thereby triggering an obligation on the part of FTS to make the Second Prepayment, in the amount of $2,125,000, within fifteen days.  FTS never made that payment.

25.     Between February and May 2012, the parties had many discussions regarding the guar market and the progress of the construction of the Facility.  In the course of these

7

discussions, FTS requested that, separate and apart from the Supply Agreement, CIG sell to FTS twenty containers of guar gum at fixed prices in order to meet FTS's immediate needs. The parties thereafter entered into a separate contract for the sale by CIG to FTS of twenty containers of guar gum at fixed prices.

<u>FTS Raises Baseless Concerns About the Status of the Facility</u>

26.    On March 16, 2012, Marc Rowland sent a letter to CIG raising specious concerns about the progress of the Facility, the relationship between CIG and its Indian Partner and when the Facility would be operational.    Inexplicably, Mr. Rowland stated in his letter that FTS had not yet been notified of the Indian Partner Agreement Date. On information and belief, FTS was fully aware that this milestone had been achieved, insofar as notice of its achievement had been sent to FTS almost two months earlier.   Mr. Rowland requested that a teleconference be held involving CIG, the Indian Partner and FTS to address the issues raised.

27.    By e-mail dated March 21, 2012, CIG responded to Mr. Rowland's letter.  CIG expressed surprise that Mr. Rowland believed that FTS had not been notified of the Indian Partner Agreement Date, and included a copy of that notice, along with the notice of the Facility Construction Date, with its response. CIG also informed Mr. Rowland that there were no issues involving the construction of the Facility, or that might jeopardize CIG's relationship with its Indian Partner, and that therefore there was no reason for FTS's purported concerns.

28.    On information and belief, the concerns raised by Mr. Rowland were fabricated and the real reason for FTS raising them was its belief that it might be able to obtain Product sufficient to meet its needs through other sources for cheaper prices.

8

29.     After receiving Mr. Rowland's letter, CIG and its Indian Partner continued work on the Facility and CIG continued to comply fully with its obligations under the Supply Agreement.

30.     On or about June 6, 2012, FTS informed CIG that it no longer was interested in purchasing the twenty containers of guar that FTS had contractually agreed to purchase and that CIG had sourced and processed to FTS's specifications.  That matter is the subject of a separate lawsuit pending in the United State District Court for the Southern District of New York.

FTS Breaches the Supply Agreement

31.     On July 2, 2012, Mr. William Hicks, the general counsel of FTS, sent the Termination Letter to CIG, purporting to cancel the Supply Agreement.  The Termination Letter claimed that "none of the expected and intended performance measures" under the Supply Agreement had occurred, and reiterated the erroneous claim that Continental had failed to provide proper notice that such measures had occurred.

32.     In sending the Termination Letter, FTS failed to identify any legitimate basis for termination or to provide any opportunity to cure any alleged breach.

33.     As a result of FTS's wrongful purported termination of the Supply Agreement and other material breaches of the Supply Agreement, CIG faces the loss of its investments in the Facility, the loss of significant profits that it would have realized from the sale of the Product to FTS, and other damages.

34.     The damages suffered by CIG as a result of FTS's wrongful conduct are no less than $54 million.

7460909-1

## AS AND FOR A FIRST CLAIM

(Breach of Contract)

35.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 34 of this Complaint as if set forth at length herein.

36.     On June 2, 2011, the parties entered into a binding contract pursuant to which, inter alia, CIG would source from a new facility and sell, and FTS would buy, 10,000 or more metric tons of Product per year over a period of five years.

37.     The Supply Agreement is valid and enforceable, and CIG performed all of its obligations under the Agreement.

38.     By, among other things, purporting to terminate the Supply Agreement and thereby refusing to accept delivery of, or to pay for, the Product produced at the Facility over the next five years, FTS breached the Supply Agreement.

39.     CIG has suffered damages as a direct result of FTS's breaches of the Supply Agreement in an amount to be determined at trial, which is no less than $54 million.

## AS AND FOR A SECOND CLAIM

(Breach of Contract)

40.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 39 of this Complaint as if set forth at length herein.

41.     Pursuant to the terms of the Supply Agreement, within fifteen days of receiving notice from CIG of the Indian Partner Agreement Date, FTS was obligated to make the Initial Prepayment, in the amount of $2,125,000.

10

42.     On January 23, 2012, CIG duly provided notice of the Indian Partner Agreement Date to FTS in accordance with the terms of the Supply Agreement.

43.     FTS failed to make the $2,125,000 Initial Prepayment.

44.     As a result of FTS's breach of its contractual obligation to make the Initial Prepayment, CIG has been damaged in an amount to be determined at trial, which is no less than $2,125,000.

## AS AND FOR A THIRD CLAIM

### (Breach of Contract)

45.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 44 of this Complaint as if set forth at length herein.

46.     Pursuant to the terms of the Supply Agreement, within fifteen days of receiving notice from CIG of the Facility Construction Date, FTS was obligated to make the Second Prepayment, in the amount of $2,125,000.

47.     On January 23, 2012, CIG duly provided notice of the Facility Construction Date to FTS in accordance with the terms of the Supply Agreement.

48.     FTS failed to make the $2,125,000 Second Prepayment.

49.     As a result of FTS's breach of its contractual obligation to make the Second Prepayment, CIG has been damaged in an amount to be determined at trial, which is no less than $2,125,000.

11

## JURY DEMAND

Plaintiff hereby demands trial by jury of this action.

WHEREFORE, Plaintiff demands that judgment be entered in this action in favor of Plaintiff and against Defendant on each of its claims in an amount to be determined at trial, which is no less than $54 million, that it be awarded interest and costs relating to this action including, but not limited to, reasonable attorneys' fees, and that it be awarded such other and further relief as is just and proper.

Dated: New York, New York
         September 13, 2012

LeClairRyan, A Professional Corporation

By: _____
         Thomas E. Butler
         E-mail: Thomas.Butler@leclairryan.com
         Nathan A. Goldberg
         E-mail: Nathan.Goldberg@leclairryan.com

885 Third Avenue
New York, New York  10022
(212) 697-6555
*Attorneys for Plaintiff*
*CONTINENTAL INDUSTRIES GROUP, INC.*

7460909-1

# **<u>EXHIBIT 1</u>**

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT (the "Agreement"), dated this 2 day of _June_ , 2011 ("Effective Date"), is entered into by and among Continental Industries Group Inc., a company organized under the laws of the State of New York and having its principal place of business at 733 Third Avenue, 20th Floor, New York, NY 10017 ("Continental"), and Frac Tech Services, LLC, a limited liability company organized under the laws of the State of Texas and having its principal place of business at 16858 Interstate Highway 20, Cisco, Texas 76437 ("Customer") (together referred to as "Parties").

### RECITALS:

A. Continental and Customer are parties to a Mutual Non-Disclosure Agreement dated February 18, 2011 (the "NDA"), which shall remain in full force and effect (attached hereto as Exhibit C); the term of which is hereby extended by this Agreement to the later of (1) the term set forth in the NDA and (2) three (3) years after the end of the Term provided for in this Agreement;

B. Customer uses various substances in its business, including without limitation Guar Gum and derivatives of Guar Gum (Guar Gum and derivatives of Guar Gum are collectively referred to herein as the "Product");

C. Customer has determined that it would like to have an additional source of Product;

D. Continental is negotiating with a partner in India that presently produces Product ("Indian Partner"). to build a new plant in India to produce Product (the "Facility") and for Continental to purchase the entire output of Product produced at the Facility for resale;

E. Customer wishes to obtain a supply of Product from Continental that Continental would source from the Facility, should the Facility be built and become operational, which Product would be supplied by Facility to Continental and thereafter be supplied to Customer in accordance with the terms hereof, which production is presently targeted at 10,000 metric tons/year of Product (approximately 22 million pounds of Product) plus, if the Facility should actually produce the same, and at Continental's option up to an additional 2,000 metric tons/year of Product, which the parties expect will aggregate to 100% of the output of the Facility when it is completed and fully operational;

F. Understanding that the Facility will be new, the Parties' target is for Continental to source from the Facility and to sell to Customer an aggregate of 50,000 metric tons/five (5) years in accordance with the schedule set forth in Section 3 hereof plus, and at Continental's option, up to an additional 10,000 metric tons/five (5) years in accordance with the schedule set forth in Section 3 hereof, and if for any reason such quantities are not actually delivered by Continental to Customer within the schedule set forth in Section 3 hereof, the Parties intend that any shortfall shall be sold and delivered by Continental to Customer during the remainder of the Term until such aggregate of 50,000 metric tons (plus, at Continental's option, up to an additional 10,000 metric tons) is sold and delivered by Continental to Customer during the Term;

G. Customer will advance to Continental the aggregate sum of $8,500,000 in four installments as provided in this Agreement, which sum will be a prepayment for Product that will be applied and credited to Customer's payment for Product at the rate of $0.06/pound of Product sold and delivered by Continental to Customer, up to an aggregate of $6,800,000 (of the $8,500,000) during the Term,

with the balance of $1,700,000 of the $8,500,000 being applied and credited to Customer as provided in this Agreement.

ACCORDINGLY, in consideration of the Recitals and the Parties' agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are acknowledged by each of the Parties, subject to Section 13 and to all of the other terms and conditions of this Agreement, the Parties agree as follows:

1.  The Facility; Notice to Customer.

(a) Continental shall promptly notify Customer, in writing, in a form agreed to by the Parties ("Assurance") of: (i) the date that Continental executes an agreement with its Indian Partner to build the Facility ("the **Indian Partner Agreement Date**"); (ii) the date that construction of the Facility commences (the "**Facility Construction Date**"); (iii) the date that construction of the foundation and building structure of the Facility is completed (the "**Facility Completion Date**"); and (iv) the date that all equipment necessary to produce Product in marketable quantities is installed in the Facility (the "**Facility Equipment Date**").

(b) Continental presently expects and anticipates that the Indian Partner Agreement Date will be within the next sixty (60) days immediately following the signing of this Agreement, and the Commercial Purchase Date (as defined in Section 3) will be within the next thirteen (13) months immediate following the Indian Partner Agreement Date.

(c) Notice to Customer by Continental, as set forth in Section 2, shall be in accordance with Section 17 below and in the form agreed to by the Parties.

2.  Prepayments by Customer; Price.  Customer agrees that:

(a) Within fifteen (15) days after Customers receives Notice from Continental of the Indian Partner Agreement Date, Customer shall pay $2,125,000.00 to Continental by wire transfer as a prepayment against delivery of the Product (the "**Initial Prepayment**").

(b) Within fifteen (15) days after Customer receives Notice from Continental of the Facility Construction Date, Customer shall pay to Continental an additional $2,125,000.00 by wire transfer as a prepayment against delivery of the Product (the "**Second Prepayment**").

(c) Within fifteen (15) days after Customer receives Notice from Continental of the Facility Completion Date, Customer shall pay to Continental an additional $2,125,000.00 by wire transfer as a prepayment against delivery of the Product (the "**Third Prepayment**").

(d) Within fifteen (15) days after Customer receives Notice from Continental of the Facility Equipment Date, Customer shall pay to Continental an additional $2,125,000.00 by wire transfer as a prepayment against delivery of the Product (the "**Fourth Prepayment**").

(e) The Price for the Product to be supplied by Continental to Customer pursuant to this Agreement shall be determined in accordance with Exhibit B, Pricing, annexed hereto, which Exhibit may be amended or supplemented in writing by Customer and Continental from time to time and at any time.

(f) Customer shall pay Continental the amount due for each shipment of the Product at the price set forth in Exhibit B, Pricing and in the related shipping invoice minus the applied credit as set forth

in this Agreement, within seven (7) days of Product delivery to Customer's Warehouse located in Chickasha, Oklahoma, USA. Subject to the conditions set forth in this Agreement, including its right of inspection and rejection, Customer shall be solely responsible to receive and pay for all Product delivered by Continental.

(g) Continental will apply payments from Customer to Continental's oldest invoices to Customer unless Continental knows Customer is not paying its debts as they come due, in which case Continental will apply payments from Customer to Continental's most recent invoices to Customer.

(h) Customer shall make all payments to Continental in U.S. dollars at such account or accounts as Continental shall from time to time and at any time notify in writing to Customer. Continental will allow Customer thirty (30) days notice of any such changes.

3.   Purchase and Sale of Product.

(a) The date the first delivery of Product actually occurs is called the **"Commercial Purchase Date."** During the Term, each consecutive twelve (12) month period from and after the Commercial Purchase Date is referred to as a **"Contract Year."** The **"Term"** is the five (5) year period commencing on the Commercial Purchase Date. The Commercial Purchase Date is targeted to be approximately thirteen (13) months after the date of the Initial Payment.

(b) During each Contract Year during the Term, Continental agrees to use commercially reasonable efforts to manufacture and deliver to Customer (i) 10,000 metric tons (10,000,000 kg) of the Product, and (ii) if Continental elects by notice to Customer and upon Customer's written acceptance, up to 2,000 additional metric tons (2,000,000 kg) of the Product, which additional tonnage will not reduce Continental's obligations under this Agreement in subsequent Contract Years thereafter.

(c) Continental will use commercially reasonable efforts to deliver to Customer 833 metric tons (approximately 1,840,000 pounds) (plus, at Continental's option and upon Customer's written acceptance, up to an additional 20% (166.6 metric tons)/month) of Product monthly, with increases in those quantities depending on any prior shortfalls in Product shipments, and which additional tonnage, if any, will not reduce Continental's obligations under this Agreement in subsequent Contract Years thereafter.

(d) Customer agrees to accept and pay for Product delivered by Continental that has been accepted and approved by Customer in accordance with the terms and conditions of this Agreement.

(e) The aggregate sum of $8,500,000 to be paid by Customer to Continental as provided in Section 2 above shall be applied and credited by Continental to Customer's payment for Product at the rate of $0.06/pound of Product sold and delivered by Continental to Customer, up to an aggregate of $6,800,000 (of the $8,500,000) during the targeted five (5) year Term and delivery period, with the balance of $1,700,000 of the $8,500,000 being applied and credited, or in the alternative, returned, to Customer at the later of (i) the conclusion of the Term, or (ii) Continental's delivery of the last shipment of Product that, when aggregated with all prior shipments of Product, makes the total of the aggregate of the Product shipped the targeted 50,000 metric tons of Product (or the targeted up to 60,000 metric tons of Product if Continental has elected to sell and deliver additional Product as provided in this Agreement),.



4.      <u>First Right of Refusal.</u>   It is anticipated that during the Term of the Agreement, the Product to be sold and delivered to Customer hereunder will account for one hundred percent (100%) of the production from the Facility. However, if there is production from the Facility in excess of the amounts stated herein, at any time during the Term, before Continental may sell Product to a third party, Continental shall first offer the Product to Customer, in writing, on the same terms and conditions (except discount) as provided for herein, including but not limited to Pricing. Customer shall have five (5) business days during which to accept said offer. If Customer does not accept said offer within said period, Continental shall be free to sell Product to any third-party. Any acceptance of an agreement between Continental and any third party pursuant to this Section shall not affect the terms already set forth and contemplated in this Agreement.

5.      Audit. Continental shall maintain a true and correct set of records pertaining to the shipment, exportation, importation and delivery of Product under this Agreement, the tonnage shipped and price charged for each shipment of Product, payments made by Customer to Continental, credits given to Customer by Continental, and sea and land insurance coverage on Product, and shall retain auditable records and other supporting documents pertaining to such matters, for a period of not less than one (1) year after the termination of this Agreement. During this one (1) year period, Customer may, upon request, audit any and all records then available to Continental relating to said aforementioned matters; provided, however, Continental shall have the right to exclude any trade secrets, formulas or processes from inspection. Continental shall respond in writing within sixty (60) days to all issues identified in an audit by Customer or representatives of the Customer. Continental and Customer shall work expeditiously to resolve all audit issues. Continental shall not pay any commission or fees or grant any rebates or other remuneration or gratuity to any employee, agent or officer of Customer.

6.      <u>Specifications.</u>   The parties agree that the Products (and their attributes) that are presently contemplated to be produced by Continental are listed on <u>Exhibit A.</u>

7.      <u>Shipments and Transfer of Title.</u>

        (a)   Prior to shipment, Continental will be responsible for a final visual inspection of all Products shipped to Customer. Continental will not ship to Customer any Product that does not pass such visual inspection.

        (b)   The Product shall be shipped payable to Continental. Continental will be responsible for the risk of loss or damage to Product during transportation to the point of delivery and acceptance at Customer's Warehouse in Chickasha, OK.  Customer's receipt of the Product shall be deemed to have occurred upon delivery.

        (c)   Each delivery of Product shall be deemed a separate sale.

        (d)   Continental is responsible for procuring and paying for all necessary shipping insurance on the Product, covering the amount Customer paid for the Product being shipped, until delivered and accepted by Customer.

        (e)   Title to the Product transfers from Continental to Customer upon delivery.

        (f)   Any Import/Export fees shall be paid for and are the responsibility of Continental, and Continental shall be responsible for and pay for all transportation from the Facility to the Customer's facility located at the 2500 Hwy 62 West Chickasha, Oklahoma USA.

8.    **Forecasts.** Continental shall provide Customer in writing, with rolling forecasts, on a monthly basis of its expected production of Product for the following month. Continental shall use commercially reasonable efforts to fill and deliver such forecasted production amounts.

9.    **Representations and Warranties.**

(a) Each of Continental and Customer represents and warrants to the other as follows:

    (i) It has full corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby;

    (ii) It shall have, prior to the commencement date, such permits, licenses and authorizations of governmental or regulatory authorities as are necessary to own its respective properties, conduct its business, and consummate the transactions contemplated hereby; and

    (iii) The execution and performance of its obligations hereunder are not and will not be in violation of or in conflict with any material obligation it has to any third party or any law regulation or order to which it is subject.

(b) Continental hereby further represents, warrants and covenants to Customer as follows:

    (i) The Product shall meet the specifications within the tolerances set forth in Exhibit A ("the Specifications") as of the date title to such Product passes to Customer;

    (ii) The Product delivered to Customer pursuant to this Agreement shall be free and clear of all liens, security interests and other encumbrances;

    (iii) The Facility, the operation of the Facility, and the manufacture, sale, transportation, exportation, importation and delivery of the Product shall be in accordance with all applicable international, national, regional, state and local treaties, laws, conventions, rules, regulations and codes;

    (iv) Continental warrants that all employees working directly for Continental or Continental's Indian Partner will be adequately trained and utilize proper safety equipment if applicable; and

    (v) Continental and its Indian Partners shall have, prior to the commencement date, such permits, licenses and authorizations of governmental or regulatory authorities as are necessary to own its respective properties, construct and operate the Facility as applicable, conduct its business, and consummate the transactions contemplated hereby.

(c) Continental makes no representations or warranties with regard to itself or the Product, express or implied, except solely as expressly set forth in this Agreement.

(d) Except solely for indemnity obligations contained in clause 9(i) herein, in no event will Continental's liability for any damages, regardless of the form of action, exceed what is provided for in Section 9 below, and in no event shall Continental be liable (I) to any third party or for any third party claim, or (II) for any special, indirect, incidental, consequential or exemplary damages, including any lost profits or goodwill, relating to or arising out of the use of the product for any purpose or reason.

(e)    No action or proceeding, regardless of form, may be commenced by Customer against Continental more than one (1) year after the final delivery of any Product which is the subject of that action or proceeding.

(f)    Continental must notify Customer in writing as soon as Continental becomes aware of any potential inability on the part of itself or its Indian Partner to fulfill the terms of this Agreement.

(g) Continental must notify Customer of any material changes in the ownership of Indian Partner named in this Agreement or in the management or operation of the Facility, promptly after Continental becomes aware of same.

(h)   In no event does this agreement imply endorsement by Customer for any negligent act of omission, intentional act, malfeasance, damage, loss or harm, regardless of the form of action, caused by Indian Partner or Continental.

(i)  Continental agrees to defend  indemnify and hold Customer harmless from, for and against any claims, causes of action, damages, fines, assessments or penalties, of any kind or character, asserted against Customer alleging any liability or responsibility    for personal injury, physical injury, wrongful death, property damage, or environmental damage, or any other damage,  arising out of or resulting from any negligent act or omission, intentional wrongful act, or violation of any civil or criminal law, treaty, convention, statute, rule, regulation, ordinance or code of or by Continental, Indian Partner and/or the operator of the Facility, during the construction and operation of the Facility, as well as during the manufacture, transportation, exportation, importation or delivery of Product hereunder.

(j)    No action or proceeding, regardless of form, may be commenced by Continental against Customer more than one (1) year after the final delivery of any Product which is the subject of that action or proceeding, save and except for non-payment for Product.

10.    Acceptance and Rejection of Goods.

(a)  Continental will conduct qualification testing on each production lot of Product before shipping Product to Customer. Such qualification testing shall be designed to ensure that the Product conforms to its corresponding specifications (with tolerances) as attached hereto in Exhibit A or otherwise agreed to by the Parties in writing.  Continental will not ship Product to Customer from any lot that does not meet the applicable product specifications (with tolerances) under this Agreement. With each Product shipment, Continental will submit to Customer a "Certificate of Analysis", attached, indicating that such lot conforms to the applicable Product specifications (with tolerances).

(b)  Within seven (7) days after Customer's receipt of the Product, Customer shall confirm to Continental whether such Product complies with the Specifications and Grades (within the tolerances) set forth on Exhibit A. Customer shall be deemed to have accepted each order of the Product if Continental does not receive written notice to the contrary in writing within seven (7) business days after Customer's receipt of such shipment, specifying in detail the grounds for such rejection. At Continental's request, Customer shall promptly supply either samples of the Product that are allegedly defective or some other evidence of the deficiency.

(c)    If Customer rejects the Products shipped due to non-conformity with the specifications (within tolerances) contained herein, Continental is responsible for a refund of or credit for the outstanding down payments applicable to the non-conforming shipment.

5/27/2011

Page 6 of 14



(d)   If for any reason consistent and verifiable major quality problems persist in the Product for a period of not less than four (4) consecutive months, as notified by Customer to Continental, then Continental shall elicit from Customer its recommendations as to solutions to those problems and shall present the same to the Facility operator to attempt to improve Product quality. If the verifiable major problems in the Product persist for more than sixty (60) days after receipt of this notice from Customer, a sample of the problematic Product shall be submitted to a mutually agreed upon independent laboratory as provided in Section 10(e).

(e)   Any and all disputes between the Parties regarding whether the Product supplied by Continental to Customer pursuant to this Agreement meets the Specifications (within the tolerances) shall be submitted to a mutually agreed upon independent laboratory. The findings of the independent laboratory shall be admissible evidence to be used in resolving such dispute or claim. The Party against whose favor the independent laboratory resolves the dispute shall be responsible for the costs of the independent laboratory.

(f)   If any Product delivered does not meet the Specifications (within the tolerances) set forth in Exhibit A, then Continental shall , at its option, either (i) provide a mutually agreeable price adjustment for the Product supplied or (ii) accept for return and replacement the Product manufactured and supplied to Customer under this Agreement which does not conform with the Specifications (within the tolerances) and for which proper and timely notice has been given by Customer; those shall be Customer's sole right and remedy with respect to any such non-conforming Product. In that event, Continental will pay all return freight and shipping charges, insurance, and import/export taxes. Continental shall use commercially reasonable efforts to replace the non-conforming shipment of the Product, or the non-conforming portion thereof, with conforming Product as soon as reasonably practicable after receipt of notice of rejection thereof and in any event will do so within ninety (90) days after receipt of notice of rejection thereof (or, if later, ninety (90) days from the date of the determination of the independent laboratory provided in Section 10(e) above).

(g)   If for any reason, Customer wishes to re-sell or otherwise dispose of any Product that it determines it does not need, or for any reason, Customer agrees to re-sell or otherwise dispose of Product only through Continental (unless Continental otherwise agrees in the specific instance), and only at a price, unless otherwise agreed in the particular instance, equal to the then-current market price for Product less three percent (3%).

11.   Force Majeure.   If Continental is prevented from complying, either totally or in part, with any of the terms or provisions set forth in this Agreement by reason of force majeure including, by way example and not of limitation, production interruptions, equipment failures, scheduled maintenance, shortage or non-availability of raw materials, workers' strikes or labor disputes, congestion at port for dispatches of the Product, disturbance in transportation from point of manufacture to sailing port, or from sailing port to destination port, fire, flood, monsoon, tsunami, earthquakes, explosion, storm, riot, war, insurrection, terrorist act, rebellion, accidents, acts of God, acts of governmental agencies or instrumentalities, failure of suppliers or any other cause or externally induced casualty beyond its reasonable control, whether similar to any of the foregoing contingencies or not, Continental shall provide written notice of such to Customer. That notice shall be provided by Continental within ninety (90) days of the occurrence of such event or circumstance and shall identify the requirements of this Agreement or such of Continental's obligations as may be affected, and to the extent so affected, those obligations shall be suspended during the period of such force majeure condition, and shipments of Products may be fulfilled by Continental thereafter. Continental shall not be liable to Customer to the extent it is prevented

from complying with this Agreement by reason of force majeure. Provided, however, if the aggregate time period for any force majeure events claimed by Continental during the Term of this Agreement exceeds nine (9) months, Customer may, in its discretion, cancel this Agreement. In such case, and within ninety (90) days following receipt of proper notice of termination given by Customer, Continental shall refund to Customer by wire transfer the un-credited portion of the total payments made to Continental by Customer pursuant to Section 2 hereof.

12.     Termination.

(a)   The Term of this Agreement may be terminated immediately:

(i)   by Continental if Customer fails to pay any amount due Continental within fifteen (15) days of when due; or

(ii)   by the non-defaulting Party in the event that the other Party shall: (A) commit a material breach or default under this Agreement, which breach or default shall not be remedied within ninety (90) days after the receipt of written notice thereof by the Party in breach or default; or (B) have made a material misrepresentation of any representation or warranty contained herein which shall not be remedied within ninety (90) days after the receipt of written notice thereof by the Party in breach or default; or

(iii)   by either Continental or Customer if the other Party becomes insolvent, makes or has made an assignment for the benefit of creditors, is the subject of proceedings in voluntary or involuntary bankruptcy instituted on behalf of or against such Party (except for involuntary bankruptcies which are dismissed within ninety (90) days), or has a receiver or trustee appointed for substantially all of its property; or

(iv)   by the mutual agreement of the Parties.

(b)   Termination of the Term of this Agreement (whether under this Section 12, on expiration of the Term or otherwise) shall be without prejudice to any rights of either party against the other that may have accrued to the date of such termination.

(c)   The parties agree to discuss, prior to the expiration of the Term, whether it is in their mutual interest to extend the Term and, if so, on what terms and conditions.

13.     Conditions.

(a)   If Continental does not, for any bona fide commercial or legal reason, continue with its joint venture with its Indian Partner or have the right to purchase all of the output of Product from the Facility or the Facility ceases all or substantially all of its output, or there is another similar outcome resulting from any such bona fide commercial or legal matter, then Continental shall have the absolute right to terminate this Agreement and thereafter, within three (3) months, to return the Prepayments actually paid to Continental, without interest, to the extent of the Prepayments not yet having been applied to the purchase price for Product. Such return of such Prepayments shall be Customer's sole right and remedy.

(b) Recognizing the time, money and effort that Continental has invested in the Facility project with the Indian Partner, Customer agrees that under no circumstance shall Customer, directly or indirectly, purchase Product from or otherwise deal during the Term (whether or not the Term is terminated sooner than the termination date specified in Section 12 above), an additional period of

three (3) years after the end of the Term, with the Facility or any of its direct or indirect owners (including without limitation the Indian Partner and its affiliates), other than solely through and with Continental. Customer agrees that this covenant is a material inducement and condition to Continental entering into this Agreement. Also recognizing the time and effort that Continental has invested in the Facility project with the Indian Partner, Customer further agrees that Continental shall, in addition to any and all other rights and remedies for damages or otherwise, have the right to seek injunctive relief without the need to post any bond or other security in the event of Customer's breach or threatened breach of this Section 12(b) and shall be entitled to recover its reasonable legal fees and expenses if it prevails.

(c) The term of the NDA is hereby amended and extended so that it will expire as set forth in Recital A above.

14.   <u>Amendment and Waiver.</u>   This Agreement (including Exhibits) may be amended, modified, superseded or cancelled, and any other of the terms or conditions hereof may be modified, only by a written instrument executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance. Failure of any Party at any time or times to require performance of any provision hereof shall in no manner affect the right of such Party at a later time to enforce the same, and no waiver of any nature, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or considered as a further or continuing waiver of any other provision of this Agreement.

15.   <u>Independent Contractors.</u>   Continental, together with its Indian Partner, and Customer are independent of each other and nothing contained herein shall be construed to create a joint venture, partnership or similar relationship. Neither Party is shall incur and liability whatsoever for which the other may become directly, indirectly or contingently liable.

16.   <u>Dispute Resolution; Governing Law; Consent to Jurisdiction; Other Applicable Law.</u>

(a)   In an effort to resolve informally and amicably any claim, controversy or dispute (whether such claim sounds in contract, tort, or otherwise) arising out of or in any way relating to this Agreement, or the breach thereof, or the Parties' relationship (a **"Dispute"**), each Party shall notify the other in writing of a Dispute that requires resolution. Such notice shall set forth the nature of the Dispute, the amount, if any, involved and the remedy sought. Each party shall designate a representative who shall be empowered and have the authority to investigate, discuss and seek to settle the Dispute.

(b) The parties' representatives shall meet in New York, NY within thirty (30) days after proper notifications of the Dispute, at a place of Customer's choosing to attempt to resolve the Dispute.

(c)   If the Dispute remains unresolved at the end of thirty (30) days after proper notifications of the Dispute, either party shall have a right to commence a non-binding confidential mediation of the Dispute, either party shall have a right to commence a non-binding confidential mediation exclusively in New York, NY , to be held under the auspices of the American Arbitration Associations ("AAA") in accordance with its rules and the applicable laws and regulations on mediation then in force, and the Parties will split 50/50 the costs of the mediator and AAA. Everything disclosed by a Party, witness or counsel in any such mediation shall be confidential and not admissible in any court or tribunal for any purpose.

5/27/2011

(d) The parties hereby submit to the exclusive personal and subject matter jurisdiction of the Federal and State courts located in New York, NY, and waive any defense of inconvenient forum.

(d) This Agreement and the rights of the parties hereunder shall be governed in all respects by the laws of New York wherein the terms of this Agreement were negotiated, excluding to the greatest extent permitted by law any rule of law that would cause the application of the laws of any jurisdiction other than New York..

(e) Each Party agrees to comply with all relevant export laws and regulations of the United States and the country or territory in which the Services are provided ("Export Laws") to assure that neither any deliverable, if any, nor any direct product thereof is: (a) exported, directly or indirectly, in violation of Export Laws, or (b) intended to be used for any purposes prohibited by the Export Las, including without limitation encryption technology, nuclear, chemical or biological weapons proliferation.

(f) The Parties further acknowledge that they are familiar with, and will comply in all respects with U.S. laws, regulations and administrative requirements applicable to this Agreement concerning the export or re-export of any Confidential Information, including, but not limited to, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Regulations ("EAR"), and the regulations and orders issued and/or administered by the U.S. Department Of The Treasury, Office Of Foreign Assets Control in relation to export control, anti-boycott and trade sanctions matters. The Parties shall each provide the U.S. Munitions List ("USML") Category and/or the Export Control Classification Number ("ECCN") applicable to any and all Confidential Information to be furnished pursuant to this Agreement in advance of furnishing the same. Each Party shall also promptly notify the other in writing of any future changes in the USML Category and/or ECCN applicable to the same, including any jurisdictional changes between the ITAR and the EAR, of which it becomes aware. Each Party agrees to be responsible for obtaining its own United States government authorizations, as applicable, including, but not limited to, export licenses or exemption authorizations applicable to any Confidential Information to be provided by one Party to the other Party in support of this Agreement. Continental shall also comply with all applicable Indian laws, regulations and administrative requirements applicable to this Agreement or the transactions provided for herein. This Paragraph shall survive termination of this Agreement.

(g) Foreign Corrupt Practices Act ("FCPA"):

(i) Customer, though not a publicly-traded company, must comply with the FCPA.

(ii) Customer shall have the right to terminate this Agreement for cause, if in its sole discretion, exercised in good faith, it determines that Continental, its Indian Partner or a direct or indirect director, officer, manager, employee, agent, representative, consultant has committed a violation of the FCPA.

(iii) Continental shall certify that, in connection with its activities conducted under this Agreement, it will comply with the FCPA and the Convention on Combating Bribery of Foreign Public Officials and has not and will not receive, directly or indirectly, any payments or gifts, or offers or promises of payments or gifts or things of value in exchange for anything that may arise out of this Agreement to Customer.

17.   <u>Assignment.</u>

(a)   This Agreement shall inure to the benefit of, and shall be binding upon each of, the Parties and their respective successors and assigns.

(b)   This Agreement cannot be assigned in whole or in part by either Party without the prior written consent of the other Party., except that Customer or Continental may, without the prior written consent of the other party, assign this Agreement in whole or in part, to (i) an affiliate or (ii) to any third party acquiring such party by merger or upon the purchase of all or substantially all of the assets of such party or (iii) in the case of Continental, to any third party acquiring all or substantially all of Continental's assets related to the Facility. In the event of any assignment to an affiliate, the assigning party shall remain primarily liable under this Agreement.

(c)   This Agreement is not for the benefit of and does not impose or create any obligations on any third party, including without limitation any affiliate or either Party, the Indian Partner or any owner or operator of the Facility.

18.   <u>Notices.</u>   Any and all notices given pursuant to this Agreement shall be in writing, and shall be deemed to have been properly given when delivered personally, by facsimile, air courier with receipt, or confirmed by registered air mail, to the appropriate party at the address shown below, or such other address as shall be specified by the Parties hereto by written notice given in accordance with this section and shall be effective upon receipt thereof. Any notice shall be effective upon receipt, which shall be deemed to occur four (4) business days after the sending by air courier, and seven (7) calendar days after the delivery of a confirmation letter to the postal authorities in the country of the Party by which it was sent.

If to Customer:

Frac Tech Services, LLC
16858 Interstate 20
Cisco, TX 76437

ATTN:  William A. Hicks, General Counsel

FAX: 817-850-1011

If to Continental:

Continental Industries Group, Inc.
733 Third Avenue, 20th Floor
New York, NY 10017
ATTN: Mr. Omer T. Karabey, President
Facsimile: 1-212-821-0020

19.   <u>Severability.</u>   In the event that any one or more of the agreements, provisions or terms contained herein shall be declared invalid, illegal or unenforceable in any respect, the validity of the remaining agreements, provisions of terms contained herein shall in no way be affected, prejudiced or invalidated thereby.

20.   <u>Confidentiality.</u>   Without prior consent by Customer, Continental shall treat as confidential and not disclose to third persons any of the Customer's confidential information, know-how,

discoveries, production methods and the like that may be disclosed to Continental or which Continental may acquire in connection with any work performed or relationship formed under this Agreement. Without limiting the terms and conditions of the NDA, Customer shall treat as confidential information obtained from Continental in the course of the dealings under this Agreement. The Customer and Continental shall each specify those items to be treated as confidential and shall mark them as "Confidential", or if disclosed orally, shall be confirmed in writing and marked confidential within ten (10) days from the date of disclosure.

21.   Entire Agreement.   This Agreement, together with the Exhibits hereto including the NDA, contains the entire agreement between the Parties hereto, and merges into itself and supersedes any and all agreements, negotiations, memoranda and the like between Continental and Customer with respect to the subject matter hereof. This Agreement shall be deemed to have been drafted jointly by the Parties and not construed for or against any Party that drafted all or any provision of this Agreement. The Parties represent and acknowledge that there have been no material representations made to either of them or their representatives as an inducement to enter into this Agreement except for what are expressly set forth and contained herein.

22.   Section Headings.   The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

23.   Counterparts.   This Agreement may be executed in any number of separate counterparts (including by electronic or facsimile delivery), each of which shall be deemed to be an original, but which together shall constitute one and the same instrument. The Parties agree to provide original signature pages to this Agreement to the other Parties promptly following execution.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Continental Industries Group, Inc.                         Frac Tech Services, LLC


By:_____                      By:_____
Omer T. Karabey, President                          Marc Rowland, CEO


5/27/2011                                                              Page 12 of 14

Exhibit A

PRODUCT DATA SHEET
NATURAL POLYMER
Brand: OSIAN
Grade: FF-004

Main Component: Lower Polysaccharide
Percentage of Component: 100%

| Properties | Limits | Methods of Analysis |
|---|---|---|
| Moisture | 8.0% (Max) | In House |
| PH | 5.5-7.5 | In House |
| Ash | 1.0% (Max) | In House |
| Protein | 5% (Max) | In House |
| AIR | 3.0% (Max) | In House |
| Particle Size Through 200 mesh (75μ) | 95% (Min) | In House |
| Viscosity ** (Fann) Initial | 40 cps (Min) | In House |

(**) 2.4 gms 500ml, 2% KCl, @511 sec$^{-1}$ min after 3 Minutes

| Packing Available: | 25 Kgs Net Paper Bags with Polyliner inside |
|---|---|
| | 50 lbs Net Paper Bags with Polyliner inside |
| | FIBC (Bulk Bags) of 1000 Kgs |
| Shelf Life: | 1 year when stored in a sealed condition in absolutely Dry Conditions |
| Safety: | Please refer to Material Safety Data Sheet |

5/27/2011

**Exhibit B**

Pricing

The prices for the Product to be supplied by Continental to Customer pursuant to the Supply Agreement to which this is Exhibit B, shall be calculated and determined as Follows:

1. Pricing for Product in any month will be the Guar Split Price plus the then-prevailing Conversion Costs DAP (delivered at point) Customer Warehouse. Chickasha, Oklahoma, for shipments from the Facility during the then-current month.

2. "Guar Split Price" means the prior month's average of the published IIndia NCDEX spot contracts for Guar Splits.

3. The "Conversion Charge" as of the date of this Agreement is $1.043 pound for the first half of calendar 2011.

4. Conversion Charge Adjustment: The Conversion Charge will be subject to review and reset at the time of the Commercial Purchase Date (i.e. at the time of the first scheduled deliveries from the Facility). The Conversion Charge will be subject to revision every six months thereafter.

5. The Conversion Charge will further vary based upon the actual Product and the Specifications for that Product.

6. Customer shall pay Continental by wire transfer not later than seven (7) days after the date of actual delivery. All payments by Customer shall be in U.S. dollars.

7. The Prepayment will be applied to payment for the Price as set forth in the Agreement to which this is Exhibit B.

8. All sales and use taxes imposed at any time or from time to time on any transactions or Product delivery shall be solely for the account of and paid by Customer.

Continental Industries Group, Inc.

By:

Omer T. Karabey. President

Dated:

Frac Tech Services, LLC

By:

Marc Rowland, CEO

Dated:  5-3c 2011

Exhibit _C_

## MUTUAL NON-DISCLOSURE AGREEMENT

Agreement dated February _18_, 2011 between Continental Industries Group Inc. ("CIG") with its principal office at 733 Third Avenue - 20th Floor, New York, NY 10017, and Frac Tech Services, LLC ("FTS"), with its principal office at 16858 IH 20, Cisco, Texas 76437.

1. Background. CIG and FTS intend to engage in discussions and negotiations concerning the establishment of business relationships between them. In the course of such discussions and negotiations, it is anticipated that either party may disclose (the "Disclosing Party") or deliver to the other party (the "Receiving Party") certain trade secrets or confidential or proprietary information for the purpose of enabling the parties to evaluate the feasibility of such business relationship. CIG and FTS have entered into this Agreement in order to assure the confidentiality of such trade secrets and confidential or proprietary information in accordance with the terms of this Agreement.

2. Proprietary Information. As used in this Agreement, the term "Proprietary Information" shall mean:

(i)     all information about either party's business, business plans, customers, strategies, trade secrets, operations, including specifically counterparty relationships and transactional details (names, products/specifications, contract/payment terms, pricing, delivery quantities/schedules, and any other commercial agreements/arrangements );
(ii)    other confidential or proprietary information designated as such in writing by the Disclosing Party, whether by letter or by the use of an appropriate proprietary stamp or legend, prior to or at the time any such trade secret or confidential or proprietary information is disclosed by the Disclosing Party to the Receiving Party; and
(iii)   information which is orally or visually disclosed to the Receiving Party by the Disclosing Party, or is disclosed in writing without an appropriate letter, proprietary stamp or legend if, a) it would be apparent to a reasonable person, familiar with the Disclosing Party's business and the industry in which it operates, that such information is of a confidential or proprietary nature the maintenance of which is important to the Disclosing Party; or if b) the Disclosing party, within thirty (30) days after such disclosure, delivers to the Receiving Party a written document or documents describing such information and referencing the place and date of such oral, visual or written disclosure and the names of the employees or officers of the Receiving Party to whom such disclosure was made.

3. Disclosure of Proprietary Information. The Receiving Party shall hold in confidence, and shall not disclose (or permit or suffer its personnel to disclose) to any person or entity outside its organization except if specifically identified in advance and consented to by the Disclosing Party, any Proprietary Information. The Receiving Party and its personnel shall use such Proprietary Information only for the purpose for which it was disclosed and shall not use or exploit such Proprietary Information for its own benefit or the benefit of another without the prior written consent of the Disclosing Party. Without limitation of the foregoing, the Receiving Party shall not cause or permit reverse engineering of any Proprietary Information or recompilation or disassembly of any software programs which are part of the Proprietary Information received by it under this Agreement and shall disclose Proprietary Information only to persons within its organization who have a need to know such Proprietary Information in the course of the performance of their duties and who are bound by a written agreement, enforceable by the Disclosing Party, to protect the confidentiality of such Proprietary Information. The Receiving Party shall adopt and maintain programs and procedures which are reasonably calculated to protect the confidentiality of Proprietary Information and shall be responsible to the Disclosing Party for any disclosure or misuse of Proprietary Information which results from a failure to comply with this provision. The Receiving Party shall be fully responsible for any breach of this Agreement by its agents, contractors, representatives and employees. The Receiving Party will promptly report to the Disclosing Party any actual or suspected violation of the terms of this Agreement and will take all reasonable further steps requested by the Disclosing Party to prevent, control or remedy any such violation.

BP
2/18/11

## MUTUAL NON-DISCLOSURE AGREEMENT

4. <u>Limitation on Obligations.</u> The obligations of the Receiving Party specified in Section 3 above shall not apply, and the Receiving Party shall have no further obligations, with respect to any Proprietary Information to the extent the Receiving Party can demonstrate, by clear and convincing evidence, that such Proprietary Information.

    (a)    Is generally known to the public at the time of disclosure or becomes generally known through no wrongful act on the part of the Receiving Party;

    (b)    Is in the Receiving Party's possession at the time of disclosure otherwise than as a result of Receiving Party's breach of any legal obligation;

    (c)    Becomes known to the Receiving Party through disclosure by sources other than the Disclosing Party having the legal right to disclose such Proprietary Information;

    (d)    Is independently developed by the Receiving Party without reference to or reliance upon the Proprietary Information; or

    (e)    Is required to be disclosed by the Receiving Party to comply with applicable laws or governmental or regulatory regulations, <u>provided that</u> the Receiving Party provides prior written notice of such disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the extent of such disclosure.

In the event of a disputed disclosure, the Receiving Party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

5. <u>Ownership of Proprietary Information.</u> The Receiving Party agrees that the Disclosing Party is and shall remain the exclusive owner of the Proprietary Information and all patent, copyright, trade secret, trademark and other intellectual property rights therein. No license or conveyance of any such rights to the Receiving party is granted or implied under this Agreement.

6. <u>Return of Documents.</u> The Receiving Party shall, upon the termination of this Agreement or the request of the Disclosing Party, return to the Disclosing Party all drawings, documents, and other tangible manifestations of Proprietary Information received by the Receiving Party pursuant to this Agreement (and all copies and reproductions thereof).

7. <u>Term and Survival of Provision.</u> This Agreement shall be effective as of the date shown above. The time period for disclosure of Confidential Information shall expire three (3) years from the effective date of this Agreement, unless terminated sooner in writing, ("the Disclosure Period") and no further exchange of Confidential Information shall occur thereafter unless this Agreement is extended as evidenced by a written amendment, letter agreement or other document executed by both parties. All other obligations of confidentiality, non-disclosure and non-use shall survive termination for a period of four (4) years from the date of termination.

8. <u>Miscellaneous.</u>

    (a)    This Agreement may not be modified, amended or discharged, in whole or in part, except by an agreement in writing signed by the Disclosing Party and the Receiving Party.

    (b)    This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

    (c)    This Agreement shall be construed and interpreted in accordance with the laws of the State of Texas.

    (d)    The provisions of this Agreement are necessary for the protection of the business and goodwill of the Disclosing Party and are considered by the Receiving Party to be reasonable for such purpose. The Receiving party agrees that any breach of this Agreement will cause the Disclosing Party substantial and irreparable damages and, therefore, in the event of any such breach, in addition to other remedies which may be available, the Disclosing Party shall have the right to seek specific performance and other injunctive and equitable relief.

## MUTUAL NON-DISCLOSURE AGREEMENT

EXECUTED as of the day and year first set forth above.

Continental Industries Group, Inc.                Frac Tech Services, LLC

By: _____        By: _____

Dan B. Couture, Chief Financial Officer            VP Corporate Controller

2/16/2011                              Page 3 of 3                              2/18/11

MOR